## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Northern Division

**JENNIFER PULLEN**
905 LEESWOOD ROAD
BEL AIR, MD 21014
[Harford County, MD]

*Plaintiff*

v.

**BALTIMORE LUTHERAN HIGH
SCHOOL ASSOCIATION, D/B/A
CONCORDIA PREPARATORY SCHOOL**
1145 CONCORDIA DRIVE
TOWSON, MD 21286
[Baltimore County, MD]

SERVE ON RESIDENT AGENT:

BRENT JOHNSON
521 IDLEWILD ROAD
BEL AIR, MD 21014

and

**LUTHERAN CHURCH-MISSOURI
SYNOD, INC., D/B/A LUTHERAN
CHURCH SOUTHEASTERN DISTRICT**
1333 S. KIRKWOOD ROAD
SAINT LOUIS, MO 63122
[St. Louis County, MO]

*Defendants.*

**Case No. _____**

**JURY TRIAL DEMANDED**

## COMPLAINT AND JURY DEMAND

**NOW COMES** the Plaintiff, Jennifer Pullen, by and through her attorneys, Ketterer,

Browne & Anderson, LLC, and brings forth this Complaint against the Defendants, Baltimore

Lutheran High School Association d/b/a Concordia Preparatory School and the Lutheran

1

Church-Missouri Synod, Inc., d/b/a Lutheran Church Southeastern District and in support sets forth the following:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Jennifer Pullen is an adult resident of Harford County, Maryland (hereinafter referred to as "Plaintiff" or "Ms. Pullen"). At the time of the allegations set forth herein, Ms. Pullen was a minor.

2.      At all times relevant to this action, Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School (hereinafter referred to as "CPS") is a corporation organized and existing under the laws of the State of Maryland that maintains its principal place of business at 1145 Concordia Drive, Towson, Maryland.

3.      At all times relevant to this action, Defendant Lutheran Church-Missouri Synod, Inc., d/b/a Lutheran Church Southeastern District (hereafter referred to as "LCMS") is a corporation organized and existing under the laws of the State of Missouri that maintains its principal place of business at 1333 S. Kirkwood Road, Saint Louis, Missouri.

4.      Defendant CPS and Defendant LCMS are hereinafter collectively referred to as "Defendants".

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claim asserts a federal question over which this Court has jurisdiction and Plaintiff asserts state-law claims over which this Court has supplemental jurisdiction.

6.      This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant CPS is domiciled in and conducts business within this judicial district.

7.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

8.      The Northern District is the proper venue per 28 U.S.C. § 100(1).

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.      Ms. Pullen enrolled at CPS as a seventh grade student in the fall of 2014, when she was just twelve years old.

10.     That same year, Ms. Pullen's mother began teaching at CPS.

11.     CPS is an elite, co-educational parochial secondary school serving grades 6-12.

12.     Originally known as Baltimore Lutheran School, CPS is operated by the Baltimore Lutheran High School Association, Inc., an organization of Lutheran churches in the Baltimore area.

13.     Like most Lutheran schools and churches, CPS is overseen by the Lutheran Church–Missouri Synod, the governing body of the Lutheran church.

14.     The Synod is divided into 35 districts, each with its own district president and staff of coordinators and overseers tasked with handling issues within member congregations and schools.

15.     According to CPS's website, the estimated annual cost of attendance for a high school enrollee is over $15,000.

16.     Although Ms. Pullen had a variety of options for her middle and high school education, she and her family chose CPS due to CPS representatives' promises of a safe, tight-knit community.

17.     CPS representatives told Ms. Pullen and her parents that the school offered a caring, closely-knit community in which she would have teachers and administrators looking out for her safety and well-being.

18.     Ms. Pullen and her parents believed she would be safe and would thrive at CPS as she had in middle school.

19.     Ms. Pullen's parents paid the full tuition and fees for attendance at CPS and did not receive financial aid from CPS.

## CPS'S HYPER-SEXUALIZED CULTURE

20.     Ms. Pullen found CPS to be far from the safe, caring community that she was promised.

21.     At various times during her tenure at CPS, Ms. Pullen experienced unwelcome sexual advances from some male students who were emboldened by formal and informal "traditions" and condoned practices at the school.

22.     The concept of CPS students engaging in sexual behavior on CPS property, often during the school day, has long been part of CPS's ethos.

23.     One of the frequent venues for sexual behavior on CPS's campus is the visiting sports team's locker room (hereinafter the "Locker Room"), which is largely unused during the school day.

24.     Students would routinely engage in sexual acts, ranging from "making out" to having intercourse, throughout the CPS campus, including empty classrooms, the courtyard, and in the hallways of the school.

25.     The culture of using the Locker Room and other locations on the CPS campus as venues for engaging in sexual behavior during the school day was a prevalent part of CPS's culture while Ms. Pullen was a student, and was well known to the faculty and administrators.

26.     This hyper-sexualized culture at CPS was fueled in large part by a general consensus that student-athletes – especially male student-athletes, whose athletic programs drew in large alumni donations – were "above the law" and free from recrimination for rule-breaking.

27.     For example, male student-athletes were routinely and categorically exempted or excused from detentions, suspensions, and other disciplinary measures when they conflicted with sports practices and games or would otherwise jeopardize the reputation of a CPS sports program.

28.     As another pertinent example, male student-athletes routinely got away with sexual assault and harassment as CPS consciously ignored incidents.

## CPS'S FAILURE TO PREVENT AND STOP SEXUAL HARASSMENT AND ASSAULT ON ITS CAMPUS

29.     CPS failed to investigate, report, or take any meaningful action to curb instances of sexual harassment and assault on its campus prior to Ms. Pullen's enrollment.

30.     Upon information and belief, other former CPS students, who are still minors, were the victims of sexual assault during their tenure at CPS for which no investigation took place.

31.     One such former student, N.H., a minor, filed a lawsuit against CPS in October 2020 for allegations concerning CPS' lack of proper investigation into sexual assaults that took place on CPS grounds in and around 2018 (Civil Action No. 1:20-cv-03132).

32.     This failure is not surprising given CPS' pattern of ignoring sexual assault and harassment.

33.     CPS was, or should have been, aware that many of its male students routinely used text messaging and social media applications, often during the school day and while using CPS' internet and email servers, to harass female students and request sexual favors to be performed on the CPS campus.

34.     CPS was, or should have been, aware that many of its male students (some of them over the age of 18) used the CPS campus as a venue for forced sexual encounters with female students.

35.     CPS knew or should have known that students used the Locker Room and other locations on the CPS campus as venues for sexual harassment and/or statutory rape and secured CPS facilities that students used as "hook-up" spots or venues for sexual behavior.

36.     CPS took no significant action to investigate this allegation or any other instances of alleged aggressive sexual behavior by its male students.

37.     Similarly, CPS failed to investigate the usage of the Locker Room and other locations on the CPS campus as venues for sexual encounters, despite readily available means that would have made it possible for CPS to determine which male students were luring female students into the Locker Room for sexual encounters.

38.     Had CPS conducted the careful investigation that was plainly warranted and taken appropriate action, these known instances of sexual assault could have been easily prevented.

39.     CPS' failure to act resulted in, among other harms, Ms. Pullen's sexual assaults in the 2018-2019 academic year as described herein.

**CPS CIRCLES THE WAGONS**

40.     Upon information and belief, a female CPS psychologist hired in or around 2017 abruptly left her position with CPS after repeated clashes with CPS Headmaster Brent Johnson,

who refused to allow the psychologist to implement mandatory reporting policies for sexual assault cases.

41.    In or around that same year, a group of CPS teachers, including Ms. Pullen's mother, reported their concerns relating to CPS's treatment of sexual assault and harassment on campus to the CPS school board and/or board of trustees. No action was taken by CPS in response.

42.    Concurrently, this group of teachers raised their concerns about the hyper-sexualized culture at CPS to administrators during monthly "all-faculty meetings", where their concerns were dismissed.

43.    Of note regarding these "all-faculty meetings" is that Ms. Grill, a CPS guidance counselor who upon information and belief routinely dissuaded female students from pursuing sexual assault allegations and who deterred the use of "assault" to describe their experiences, kept the minutes of those meetings along with HR director Jimmy Carter.

44.    In the midst of this unrest between concerned faculty members and the CPS administration, and in an effort to silence the growing number of reports of assault that came forth from survivors of abuse at CPS during the 2018-2019 academic year, the LCMS dispatched a crisis management team to CPS.

45.    Among the LCMS employees sent to CPS to handle the mounting reports of sexual assault and harassment on campus was Sally Hiller, Executive Director for Congregational Outreach and District Operations for the Southeastern District of LCMS.

46.    Ms. Hiller met with faculty on more than one occasion during the 2018-2019 school year, not in an effort to understand and respond to their concerns, but instead to institute

intimidating gag orders and quash the faculty's push for the administration to implement more stringent policies concerning sexual assault and harassment.

47.     Upon information and belief, several members of this cadre of concerned teachers left their jobs at CPS at the conclusion of the 2018-2019 school year in protest of the CPS administration's treatment of sexual assault and harassment issues throughout the school.

### MS. PULLEN IS REPEATEDLY ASSAULTED ON CPS' CAMPUS

48.     In or around the late fall of 2018, Ms. Pullen broke up with her then-boyfriend, a member of the CPS boys' soccer team.

49.     Following the break up, members of the boys' soccer team, who had previously shown Ms. Pullen a modicum of respect because her boyfriend was their teammate, began to verbally harass Ms. Pullen during classes and on the CPS campus.

50.     The incidents of harassment also involved comments made to Ms. Pullen via text messages and SnapChat messages, often sent to Ms. Pullen during the school day and after school.

51.     Ms. Pullen had a number of classes with members of the boys' soccer team, including "A", "D", and "R" (collectively, the "Soccer Assailants") as well as a football player named "C" who also engaged in harassing behavior.

52.     The Soccer Assailants routinely made comments about Ms. Pullen to her face and to other students, often within earshot of faculty members, in which they expressed a desire to have sex with Ms. Pullen or described her body – the body of an underage girl – as being ripe for sexual intercourse and sexual favors.

53.     The Soccer Assailants would also make sexually explicit gestures towards Ms. Pullen, including stretching their mouths wide open to simulate a woman giving oral sex onto a man's anatomy, communicating their desire that Ms. Pullen perform such sexual acts on them.

54.     Ms. Pullen found it difficult to pay attention in class when these comments and crude gestures were made.

55.     Ms. Pullen's grades suffered as a result of the harassment she endued; yet none of her teachers approached her or the administration with concerns about the decline in her academic performance and what might be causing the decline.

56.     The Soccer Assailants made similar lewd gestures towards Ms. Pullen during volleyball games and football games at which Ms. Pullen performed as a member of the cheerleading team.

57.     Ms. Pullen reported the harassment to her teacher and cheerleading coach, Mrs. Sue Welinsky, who told Ms. Pullen that she would take care of it and that "everything would be fine".

58.     As the harassment continued, Ms. Pullen reported her concerns to Mrs. Welinsky on a continual, ongoing basis.

59.     Despite her promises, and the fact that Mrs. Welinsky taught Spanish class where Ms. Pullen and the Soccer Assailants were all students, no action was taken against the Soccer Assailants in response to Ms. Pullen's reports.

60.     Around this same time, C made similar comments to and about Ms. Pullen, including referring to her as "pound cake", a crude insinuation of his desire to have sex with Ms. Pullen, both in front of Ms. Pullen and in front of her mother, his teacher.

61.     These comments were also overheard by another CPS teacher, Mr. Genszler, who did not take action in response to hearing those comments.

62.     Ms. Pullen's mother was appalled and demanded that C stop using disrespectful language when addressing her daughter, which did not deter C.

63.     Ms. Pullen and her mother reported C's harassment to CPS Headmaster Brent Johnson, who instructed them to "leave it alone", and discouraged Ms. Pullen from further reporting the conduct.

64.     C's harassment continued unabated.

65.     In or around March 2019, during two different occasions in anatomy class, D and A sexually assaulted Ms. Pullen by using their bodies to shield her desk and each student put their hand up Ms. Pullen's skirt.

66.     These assaults were not observed by others in the class due to the setup of desks and counter space in the laboratory classroom.

67.     Ms. Pullen was afraid for her safety and in shock from these unwelcome advances.

68.     In or around late March 2019, Ms. Pullen attended her math class, where R and other male students were standing such a manner as to block certain desks, including Ms. Pullen's desk, from the view of the teacher.

69.     While Ms. Pullen took notes, R grabbed her arm and forced her hand against his clothed penis.

70.     Ms. Pullen told Mrs. Welinsky about the assault the same day.

71.     Mrs. Welinsky once again assured Ms. Pullen that she would take care of it.

10

72.     Another male student witnessed the assault and later corroborated Ms. Pullen's report to CPS administrators.

73.     Following her report, Ms. Pullen was called to the administration offices every day for about a week, often pulled out of class by Mrs. Welinsky directly and in front of her classmates, leading to speculation and gossip as to the reason for her absences from class.

74.     Among the administrators who questioned Ms. Pullen were CPS Headmaster Brent Johnson and Ms. Grill, a guidance counselor.

75.     In or around the same time, other female CPS students reported allegations of sexual harassment and assault to CPS administration, many of which involved the Soccer Assailants.

76.     When the Soccer Assailants were questioned about reports of sexual assault and harassment by female students, there was little doubt about who lodged the complaints, as the Soccer Assailants had each seen Ms. Pullen removed from class by Mrs. Welinsky on several occasions.

77.     Ms. Pullen disclosed her sexual assaults and harassment to CPS administrators who failed to report the sexual assault to state or local authorities, failed to conduct a thorough investigation, failed to do anything to stop the ongoing sexual assaults and harassment, and failed to offer Ms. Pullen *any* accommodations based on the sexual harassment and assaults she had reported.

78.     CPS and LCMS failed to make any report to state or local authorities, failed to conduct a thorough investigation, and failed to offer Ms. Pullen any accommodations for the sexual assaults and harassment that she had experienced on CPS' campus.

79.     Upon information and belief, these issues continue to pervade the CPS campus.

### MS. PULLEN IS TREATED LIKE A PROBLEM, NOT A SURVIVOR

80.     Throughout the week of questioning, it became apparent to Ms. Pullen and her mother that the administrators were skeptical of Ms. Pullen's reports and sought only to protect the Soccer Assailants from any further gossip, speculation, and most of all, discipline.

81.     CPS administrators circulated rumors to the faculty – which were heard by Ms. Pullen's own mother – that Ms. Pullen must have wanted the sexual attention from the Soccer Assailants because she previously posted a semi-nude photo of herself on social media.

82.     This allegation was and remains patently false, as Ms. Pullen never posted such a photograph of herself on any social media platform and certainly did not welcome the Soccer Assailant's assaults.

83.     No disciplinary action was taken with respect to the Soccer Assailants or C.

84.     Following the incident, Ms. Pullen elected to attend school virtually for a number of days so that she could stay home and avoid her assailants, as well as other CPS students who began to bully her for speaking out against the male athletes.

85.     During this time, Ms. Pullen and her mother came to realize that Ms. Pullen would have to attend a different high school for her senior year for her own safety and well-being.

86.     Shortly thereafter, Ms. Pullen was called to a meeting with CPS administrators, including Headmaster Brent Johnson, during which Ms. Pullen was informed that she had received a one-day suspension.

87.     Headmaster Brent Johnson told Ms. Pullen and her mother that if Ms. Pullen continued to speak out about the assaults she could jeopardize the Soccer Assailants' college athletics scholarships.

88.     Mr. Johnson warned Ms. Pullen and her mother that if Ms. Pullen continued to speak out about her assaults or pursue discipline of the Soccer Assailants, he would inform her intended transfer school of the suspension, thereby threatening her admission to the transfer school.

89.     Mr. Johnson told Ms. Pullen and her mother that he would not report the suspension to Ms. Pullen's intended transfer school if she remained silent about the assaults.

90.     Overwhelmed by trauma and CPS' failure to do anything about it, Ms. Pullen began to exhibit symptoms of anxiety and depression.

91.     Based on her experience at CPS, Ms. Pullen's parents decided not to enroll Ms. Pullen in the school for the following year, which resulted in Ms. Pullen having to adjust to a new environment while still processing the sexual assault that occurred months earlier.

92.     Due to the severity of her emotional distress stemming from her encounters of sexual assault at CPS, the sexually hostile environment at CPS, and the treatment she received from administrators at CPS and LCMS, Ms. Pullen was forced to undergo extensive mental health treatment.

93.     Ms. Pullen gave up on her dreams of attending a four-year college in Florida so that she could stay close to home and safe from unknown people and places.

94.     Ms. Pullen currently attends a local community college, a higher education path far below the expectation of someone with her talent and intelligence.

## CAUSES OF ACTION

### COUNT I – *Violation of 20 U.S.C. § 1681, et. seq.*
*Title IX of the Education Amendments Act*

**Against Defendant CPS**

13

95.     Plaintiff incorporates and realleges all paragraphs of this Complaint into this Count.

96.     During the relevant timeframe, Defendant CPS was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

97.     Defendant exercised substantial control over the students who assaulted Ms. Pullen and over the boys who harassed her.

98.     All the events giving rise to this claim occurred on CPS' grounds.

99.     In or about March 2019, Ms. Pullen faced severe discrimination based on sex when she was sexually assaulted verbally and physically on school grounds by CPS students, some of whom were over the age of 18. The sexual assaults and harassment Ms. Pullen endured were sufficiently severe, pervasive, and objectively offensive to constitute a hostile educational environment for her at CPS.

100.    Defendant CPS was on actual notice of the sexual assaults committed on Ms. Pullen and the hypersexual hostile environment that existed at the school during Ms. Pullen's time there.

101.    Despite being on actual notice of the assaults on and harassment of Ms. Pullen, Defendant CPS failed to take meaningful action to investigate the assault and/or to protect Ms. Pullen from retaliation on the part of faculty, staff, and fellow students regarding Ms. Pullen's attempts to seek out a safe educational environment.

102.    Defendant CPS acted with deliberate indifference to the complaints and other notice regarding the ongoing hostile education environment, ongoing threats, bullying, and retaliation faced by Ms. Pullen after reporting that she was sexually assaulted.

103.    The hostile educational environment at CPS effectively barred Ms. Pullen's access to educational opportunities and benefits because she was forced to leave CPS due to the continuing hostile environment at the school and due to ongoing bullying and retaliation at the school.

104.    In addition to the foregoing violations of Title IX, Defendant CPS violated its Title IX obligations by:

   a.  Failing to have a Title IX coordinator or any other person to receive complaints about gender-based discrimination, harassments, and/or assaults;

   b.  Failing to have any policy for a student's reporting of sexual harassment and/or sexual assault;

   c.  Failing to have a program for prevention of sexual harassment and sexual assault;

   d.  Failing to have a program or policy for investigating sexual harassment or sexual assault;

   e.  Failing to have a program or policy for offering accommodations to victims of sexual assault;

   f.  Failing to have a program or policy for preventing retaliation against those who report sexual harassment and/or sexual assault;

   g.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

   h.  Retaliating against Ms. Pullen for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

105.    As a direct and proximate cause of Defendant CPS' violation of Title IX, Ms. Pullen has been deprived of educational opportunities and benefits that delayed her academic attainment during her high school education and thereafter. This deprivation was the result of Defendant's deliberate indifference to the hostile educational environment at CPS.

106.    As a direct and proximate cause of Defendant CPS' violation of Title IX, Ms. Pullen has experienced and will likely continue to experience severe emotional distress accompanied by objective physical manifestations and/or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), loss of functioning, loss of earning potential, medical bills, and other pecuniary harms to be established at trial.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT II – *Negligent Supervision and Retention*

**Against Defendant CPS and Defendant LCMS**

107.    Plaintiff incorporates and realleges all paragraphs of this Complaint into this Count.

108.    Defendants had a fiduciary relationship with Ms. Pullen as both a student and minor under the age of 18.

109.    As a Maryland educational institution, Defendant CPS owed Ms. Pullen a special duty of trust and confidence to ensure her safety and well-being.

110.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, and Defendant LCMS breached their duty owed to Ms. Pullen by, among other things:

a.  Failing to properly protect Ms. Pullen, then a minor, from sexual abuse and harassment;

b.  Improperly protecting Ms. Pullen, then a minor, from sexual abuse and harassment;

c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report Ms. Pullen's sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against Ms. Pullen after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with Ms. Pullen when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against Ms. Pullen for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

111.   Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Ms. Pullen to be sexually assaulted and harassed and that the lack of protocols for which incidents of sexual assault were reported were woefully insufficient.

112.   Defendants failed to provide adequate training, monitoring, and supervision of its administrators, faculty, and/or staff concerning reports of sexual assault.

113.   Defendants carelessly and recklessly failed to supervise its male students, even after specific complaints of sexual assault and harassment had been lodged against them by various students, including Ms. Pullen.

114.   Defendants failed to implement training and monitoring mechanisms by which sexual assaults such as those suffered by Ms. Pullen could have been prevented, or at the very least, appropriately reported to parents and law enforcement authorities.

115.   Defendants' conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

116.   As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, Ms. Pullen has experienced and will likely continue to experience severe emotional distress

accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

117.    As a direct and proximate result of Defendants' negligence, Ms. Pullen sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT III – *Negligence*

#### Against Defendant CPS and Defendant LCMS

118.    Plaintiff incorporates and realleges all paragraphs of this Complaint into this Count.

119.    In the fall of 2017, Ms. Pullen enrolled at CPS and was thereby deprived of the protection of her parents while on school grounds and during the school day.

120.    Upon Ms. Pullen's enrollment, Defendant CPS assumed custody of her and other students while on the school's premises.

121.    In so doing, Defendant CPS entered into a relationship with Ms. Pullen that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect Ms. Pullen from reasonably foreseeable harm.

122.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, breached their duty owed to Ms. Pullen by, among other things:

a.  Failing to properly protect Ms. Pullen, then a minor, from sexual abuse and harassment;

b.  Failing to identify and eliminate, minimize, and/or address known and foreseeable risks of physical and emotional injury;

c.  Improperly protecting Ms. Pullen, then a minor, from sexual abuse and harassment;

d.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

e.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

f.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

h.  Failing to promptly report Ms. Pullen's sexual assaults to the authorities;

i.  Failing to take any action to prevent retaliation against Ms. Pullen after her assaults were reported to CPS;

j.  Failing to conduct an exit interview with Ms. Pullen when she left the school;

k.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

l.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

m.   Retaliating against Ms. Pullen for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

123.   Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Ms. Pullen to be sexually assaulted and harassed.

124.   Defendants' conduct was wanton, malicious, or oppressive in that Defendants disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

125.   As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, Ms. Pullen has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

126.   As a direct and proximate result of Defendants' negligence, Ms. Pullen sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

<u>**COUNT IV – *Premises Liability***</u>

**Against Defendant CPS**

127.    Plaintiff incorporates and realleges all paragraphs of this Complaint into this Count.

128.    While on CPS' premises, Ms. Pullen was a business invitee of Defendant CPS.

129.    Defendant CPS owed Ms. Pullen a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

130.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect Ms. Pullen and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

   a.  Failing to properly protect Ms. Pullen, then a minor, from sexual abuse and harassment;

   b.  Improperly protecting Ms. Pullen, then a minor, from sexual abuse and harassment;

   c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

   d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

   e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks,

Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.   Failing to promptly report Ms. Pullen's sexual assaults to the authorities;

h.   Failing to take any action to prevent retaliation against Ms. Pullen after her assaults were reported to CPS;

i.   Failing to conduct an exit interview with Ms. Pullen when she left the school;

j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against Ms. Pullen for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

131.   Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Ms. Pullen to be sexually assaulted and harassed.

132.   Defendant CPS' conduct was wanton, malicious, or oppressive in that Defendant CPS disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

133.   As a direct and proximate cause of Defendant CPS' violation of its fiduciary duty to her, Ms. Pullen has experienced and will likely continue to experience severe emotional

distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

134.    As a direct and proximate result of Defendant CPS' negligence, Ms. Pullen sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT V – *Intentional Infliction of Emotional Distress*

### Against Defendant CPS and Defendant LCMS

135.    Plaintiff incorporates and realleges all paragraphs of this Complaint into this Count.

136.    While on CPS' premises, Ms. Pullen was a business invitee of CPS.

137.    Defendants owed Ms. Pullen a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

138.    Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect Ms. Pullen and her fellow female students from foreseeable dangers of which CPS had ample actual notice,

including, among other things:

    a.  Failing to properly protect Ms. Pullen, then a minor, from sexual abuse and harassment;

    b.  Improperly protecting Ms. Pullen, then a minor, from sexual abuse and harassment;

    c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

    g.  Failing to promptly report Ms. Pullen's sexual assaults to the authorities;

    h.  Failing to take any action to prevent retaliation against Ms. Pullen after her assaults were reported to CPS;

    i.  Failing to conduct an exit interview with Ms. Pullen when she left the school;

    j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against Ms. Pullen for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

139.   Defendant LCMS and Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Ms. Pullen to be sexually assaulted and harassed.

140.   Defendants' conduct was extreme and outrageous, and it intentionally or recklessly caused Ms. Pullen severe emotional distress.

141.   Defendants' conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

142.   Defendants purposefully intended to cause or recklessly disregarded the high probability of causing a disturbance of Ms. Pullen's emotional tranquility that was so severe that harmful physical consequences resulted.

143.   As a direct and proximate cause of Defendants' violation of its fiduciary duty to her, Ms. Pullen has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

144.   As a direct and proximate result of Defendants' negligence, Plaintiff Ms. Pullen sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses,

incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT VI – *Negligent Infliction of Emotional Distress*

#### Against Defendant CPS and Defendant LCMS

145.    Plaintiff incorporates and realleges all paragraphs of this Complaint into this Count.

146.    Defendants had a duty to Ms. Pullen to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

147.    To the extent Defendants' conduct is not found to be reckless and/or intentional, the conduct is—at the very least—negligent.

148.    Defendants' negligent acts include, but are not limited to:

a.    Failing to properly protect Ms. Pullen, then a minor, from sexual abuse and harassment;

b.    Improperly protecting Ms. Pullen, then a minor, from sexual abuse and harassment;

c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d. Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e. Failing to investigate, prohibit, and/or otherwise address the formation or the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f. Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g. Failing to promptly report Ms. Pullen's sexual assaults to the authorities;

h. Failing to take any action to prevent retaliation against Ms. Pullen after her assaults were reported to CPS;

i. Failing to conduct an exit interview with Ms. Pullen when she left the school;

j. Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k. Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l. Retaliating against Ms. Pullen for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

149. As a direct and proximate cause of Defendants' malfeasance and nonfeasance, Ms. Pullen has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

150.    As a direct and proximate result of Defendants' negligence, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiff demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues in this action so triable.


Dated: <u>November 5, 2020</u>                          Respectfully submitted,

                                                         /s/ Justin Browne
                                                        Justin Browne (Bar No. 29164)
                                                        Christina Graziano (*pro hac vice* to be filed)
                                                        KETTERER, BROWNE & ANDERSON, LLC
                                                        336 S. Main Street
                                                        Suite 2A-C
                                                        Bel Air, MD 21014
                                                        Phone: (855) 522-5297
                                                        Fax: (855) 334-5626
                                                        Justin@KBAAttorneys.com
                                                        Christina@KBAattorneys.com